**Shereen ARENT, et al., Plaintiffs,**

v.

**Donna SHALALA, Secretary of the U.S. Department of Health and Human Services, Defendant.**

Civ. A. No. 92–0148 (JLG).

United States District Court, District of Columbia.

Aug. 11, 1994.

---

Brian Wolfman and Alan B. Morrison, Public Citizen Litigation Group, Washington, DC, for plaintiffs.

Philip S. Derfler, Associate Chief Counsel for Enforcement, U.S. Food and Drug Admin., Rockville, MD and Drake Cutini, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM

JUNE L. GREEN, District Judge.

## I. INTRODUCTION

In this case, an individual consumer and two public interest organizations challenge final regulations promulgated by the U.S. Food and Drug Administration (FDA) to implement the Nutrition Labeling and Education Act of 1990 (NLEA). This matter is before the Court on the Plaintiffs' Motion for Summary Judgment and the Defendant's Motion to Dismiss. The Court holds that the regulations are not arbitrary and capricious and therefore, the Defendant's Motion to Dismiss is GRANTED.

## II. FACTS

On November 8, 1990, Congress enacted the Nutrition Labeling and Education Act of 1990, 21 U.S.C. § 343(q) (1990). The Act contains various nutritional labeling require-

ments for foods that are intended for human consumption. Food sold for human consumption that is not in compliance with the NLEA will be considered misbranded, and persons selling such food are subject to civil and criminal enforcement provisions of the Food, Drug and Cosmetic Act. 21 U.S.C. §§ 331, 332, 333(a)(1)–(2), 334.

The NLEA, however, treats differently the nutritional labeling of raw agricultural commodities and fish. The NLEA directed the Defendant to issue voluntary guidelines for grocery stores to provide nutrition information to consumers of the twenty most popular raw fruits, raw vegetables, and types of raw fish. 21 U.S.C. § 343(q)(4)(B). The guidelines would remain voluntary as long as the industry substantially complied with the statute. This arrangement differs from the mandatory nutritional information requirements which apply to other foods. 21 U.S.C. § 343(q)(4)(A).

Twelve months after November 8, 1990, the NLEA required the Defendant to issue a final regulation defining the circumstances that constitute "substantial compliance" by food retailers with the voluntary guidelines. 21 U.S.C. § 343(q)(4)(B)(ii). The statute states that there is not substantial compliance if a "significant" number of retailers have failed to comply with the guidelines. *Id.* The size of the retailers and the portion of the market served by retailers in compliance with the guidelines must be considered in determining whether or not the "substantial compliance" standard has been met. *Id.*

On November 27, 1991, the FDA published a final regulation which defined "substantial compliance" and explained its methodology in making the determination. 56 Fed.Reg. 60886–60887, 60890. In making its determination, the FDA stated that it would survey 2,000 representative retailers, including all of the chain retailers and a representative sample of independent companies. 21 C.F.R. § 101.43(b). The regulations also state that "substantial compliance" with the regulations occurs if at least sixty percent of all stores in

the FDA survey are in compliance with the voluntary guidelines. 21 C.F.R. § 101.43(c). The FDA also determined that any one store which sells produce or raw fish is in compliance with the voluntary guidelines if that store provides nutritional labeling for at least 90 percent of its raw fruits and raw vegetables and 90 percent of its raw fish. 21 C.F.R. § 101.43(a).

The NLEA required the Defendant to issue a report thirty months after May 8, 1990, detailing her experience with the guidelines and determining whether there is "substantial compliance" with the guidelines. 21 U.S.C. § 343(q)(4)(C)(i). If the Defendant finds that there is "substantial compliance" with the guidelines, then the Secretary shall issue a report and make "substantial compliance" determinations every two years. 21 U.S.C. § 343(q)(4)(C)(ii).[1]

It also directs the Defendant to issue mandatory regulations if, after a comprehensive survey, the Defendant determines that grocery stores are not in "substantial compliance" with the voluntary guidelines. If there is no "substantial compliance" with the guidelines, the Defendant is required to propose mandatory regulations of the type required for other foods. 21 U.S.C. § 343(q)(4)(D)(i).

The Plaintiffs argue that 21 C.F.R. § 101.43(c), which permits 40 percent of surveyed stores not to comply with the guidelines while finding "substantial compliance" in the industry, is arbitrary and capricious and violates § 343(q)(4)(B)(ii) of the NLEA. The Plaintiffs also claim that 21 C.F.R. § 101.43(a), which permits a retailer to be in compliance with the guidelines if that retailer complies with the guidelines for at least 90 percent of the raw agricultural commodities and 90 percent of the raw fish sold by that retailer, is arbitrary and capricious and violates § 343(q)(4)(B)(ii) of the NLEA. Plaintiffs argue that these two regulations, therefore, are invalid under the Administrative Procedure Act, 5 U.S.C. § 706(2).

The Plaintiffs urge the Court, *inter alia,* to declare invalid 21 C.F.R. § 101.43(c) and 21

---

1. On May 8, 1993, the FDA issued the Report on Voluntary Compliance by Food Retailers in Providing Nutrition Labeling Information for Raw Fruits and Vegetables and for Raw Fish. 58 Fed.Reg. 28985. The Report found that 73–75 percent of retail grocery stores, on an industry-wide basis, are in substantial compliance with the voluntary guidelines.

C.F.R. § 101.43(a); enjoin the Defendant from using these regulations to make any "substantial compliance" determinations under 21 U.S.C. § 343(q)(4), and order the Defendant to promulgate mandatory nutritional labeling regulations for raw fruits and vegetables and raw fish as required under NLEA. In addition, the Plaintiffs ask the Court to invalidate the FDA's Report of May 8, 1993, which finds that the surveyed retailers were in "substantial compliance" with the guidelines.

The Defendant filed a Motion to Dismiss the Plaintiffs' complaint on the following grounds: 1) the Plaintiffs present no "case or controversy" because their allegation of injury is speculative; 2) this Court has no jurisdiction over the Plaintiffs' claim since Congress committed this matter to the Defendant's discretion; and 3) the interpretation of the statute is not arbitrary or capricious.

## III. DISCUSSION

### A. "Case or Controversy"

■ In order to limit federal judicial power to the resolution of "cases" or "controversies", the Supreme Court has developed a doctrine of standing which requires a complainant to allege: 1) a personal injury-in-fact that is 2) "fairly" traceable to the defendant's conduct and 3) redressable by the relief requested. *Branton v. FCC*, 993 F.2d 906, 908 (D.C.Cir.1993) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)), *cert. denied*, —— U.S. ——, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994). The party invoking federal jurisdiction bears the burden of establishing these elements. *Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). When deciding standing issues, a trial court "must accept as true all material allegations of the complaint." *United Transportation Union v. ICC*, 891 F.2d 908, 911 (D.C.Cir.1989) (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)), *cert. denied*, 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990). When a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, standing is not precluded, but it is ordinarily "substantially more difficult" to establish. *Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992). When the existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. *Id.*

■ An injury-in-fact is an invasion of a legally-protected interest which is: a) concrete and particularized and b) actual or imminent, not conjectural or hypothetical. *Id.* at ——, 112 S.Ct. at 2136. The D.C. Circuit has found injury-in-fact where the defendants actions impaired the plaintiffs' access to certain goods. *See, Competitive Enterprise Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C.Cir. 1990) (standing found where plaintiffs were allegedly injured by loss of opportunity to buy larger passenger vehicles). In this case, the Plaintiffs claim that the FDA's actions have reduced the availability of nutrition information which Plaintiffs may receive at grocery stores. The Court finds that "the denial of nutrition information" is a sufficiently concrete and current allegation of injury to satisfy the injury-in-fact requirement of standing.

■ The questions of causation and whether the requested relief would redress the injury substantially overlap where the petitioners seek only the cessation of illegal conduct. *Id.* In order to satisfy the causation requirement, Plaintiffs need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. *Id.* (quoting *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 75, fn. 20, 98 S.Ct. 2620, 2631, fn. 20, 57 L.Ed.2d 595 (1978)). This also applies to cases where the injury depends on the reactions of third parties to the agency's conduct. *Id.* A match between

the statutory objective behind the agency regulation and the alleged injury can facilitate finding a causal link between the agency's conduct and the injury. *Id.* at 114; *National Wildlife Federation v. Hodel,* 839 F.2d 694, 708 (D.C.Cir.1988) (Congress can provide legislative assessments which courts can credit in making standing determinations). A congressional finding of causation is not essential when there is evidence in the administrative record supporting the causal link. *Id.* There can be little doubt that the statutory objective of the NLEA is to prod retail stores into providing more information to consumers with respect to the nutritional value of produce and fish. If setting a higher standard cannot result in consumers receiving more nutrition information then the statute makes no sense. In addition, there can be no doubt that the industry's participation in the rulemaking process suggests that the proposed rules would influence their behavior. The Court believes that there is a substantial likelihood that the agency's definition of "substantial compliance" is the cause of the Plaintiffs' alleged injury.

With respect to redressability, Plaintiffs need not prove that granting the requested relief is certain to redress their injury, especially where some uncertainty is inevitable. *Id.* at 118. A mere likelihood will do. *National Wildlife Federation v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988). The Defendant argues that the NLEA only seeks voluntary compliance with the guidelines and therefore, a regulation providing a higher "substantial compliance" figure would still not affect retail stores who have the option to ignore the guideline.

The Court believes that the Defendant's view of the NLEA is too restrictive. The voluntary portion of the NLEA must be read in a larger context which includes the introduction of mandatory regulations if voluntary compliance is unsuccessful. The existence of this threat notifies the retailers that they may ignore nutritional labelling programs at the risk of a statutorily-imposed nutrition information program.

The relief that the Plaintiffs request would redress their injury because by setting a "substantial compliance" figure in accord with congressional intent, either of two things would occur: the industry would provide the amount of information which Congress envisioned or the Plaintiffs would gain the protection of mandatory guidelines and receive the information. A higher substantial compliance figure does not ensure immediate receipt of nutrition information, but it does make the imposition of mandatory guidelines and the subsequent release of nutrition information more likely.

As a matter of logic, if the Court were to defer ruling until the Defendant imposed mandatory regulations, the Defendant and retail stores could potentially avoid review forever. If, for instance, the FDA set the level of "substantial compliance" at an extremely low number, retail stores could provide little nutrition information and easily satisfy the guidelines thus preserving the "voluntary" guidelines. The Defendant would then argue that since the guidelines were "voluntary", the Court could not intervene in order to correct this situation even though the stores were frustrating the will of Congress. Though the NLEA permits the industry to cause "injury" to the Plaintiffs during the "voluntary" phase, that is no reason to allow it to occur in perpetuity.

Beyond the constitutional requirements, the federal judiciary has also adhered to a prudential principle that requires a plaintiff's complaint to fall within the "zone of interests" to be protected or regulated by the statute or constitutional guarantee in question. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). The zone of interests adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with the law, since Congress itself has pared back traditional prudential limitations by the Administrative Procedure Act (APA). *FAIC Securities, Inc. v. United States,* 768 F.2d 352, 357 (D.C.Cir. 1985).

The APA confers standing to a person aggrieved by agency action within the meaning of a relevant statute. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 394,

107 S.Ct. 750, 754, 93 L.Ed.2d 757 (1987) (quoting § 10 of the Administrative Procedure Act, 5 U.S.C. § 702).

■ Under the APA, a plaintiff must meet two requirements. First, the person claiming the right to sue must identify some "agency action" that affects him in the specified fashion; it is judicial review "thereof" to which he is entitled. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990). When review is sought under the general review provisions of the APA, the challenged "agency action" must be "final agency action". *Id.* (quoting 5 U.S.C. § 704). The Court finds that the disputed regulations, promulgated after an announcement of a proposed rule and consideration of comments by interested parties, are clearly definitive and represent "final agency action."

■ Under the second requirement of § 702, a plaintiff must show that he has suffered legal wrong because of the challenged agency action, or is "adversely affected or aggrieved" by that action "within the meaning of a relevant statute." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). The plaintiff must establish that the injury he complains of falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. *Id.* The essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress

intended to permit suit. *Id.* The "zone of interest" inquiry seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives. *Id.* at 397, fn. 12, 107 S.Ct. at 750, fn. 12. Congress clearly crafted § 343(q)(4) for the benefit of people who shop for produce and fish at grocery stores throughout this nation.[2] Plaintiff Arent, a frequent purchaser of produce and fish, falls into this category and Plaintiff Center for Science in the Public Interest and Plaintiff Public Citizen represent members who want access to nutrition information when they purchase produce and fish. (Pls.' Compl. at 2–3) Given their direct interest in the resolution of the issue before the Court, it is beyond doubt that Congress intended for this class of plaintiffs to challenge any agency disregard of § 343(q)(4).

The Court holds, therefore, that the Plaintiffs have standing to bring this suit and the Defendant's Motion to Dismiss on this ground is denied.

**B. Action Committed to Agency Discretion Under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2).**

■ Under § 701(a)(2) of the Administrative Procedure Act, an agency action is not subject to judicial review if such action "is committed to agency discretion by law." When deciding whether Congress has committed a particular action to agency discretion by law, the Court must remember that the Supreme Court has read the APA as embodying a basic presumption of judicial review. *Lincoln v. Vigil,* —— U.S. ——, ——, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). Yet, review is not appropriate in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of dis-

---

**2.** The legislative history reveals the following: The Surgeon General has advised Americans that diets low in fats, low in salt and high in fiber can reduce the risk of chronic diseases such as cancer and heart disease. Health claims supported by a significant scientific agreement can reinforce the Surgeon General's recommendations and help Americans to maintain a balanced and healthful diet. Similarly, statements regarding the level of these nutrients in foods will assist Americans in following the Surgeon General's guidelines. H.R.Rep. No. 101–538 101st Cong., 2nd Sess. at 9–10 (1990) U.S.Code Cong. & Admin.News 1990, 3336, 3339.

cretion. *Id.* at ——–——, 113 S.Ct. at 2030–31. (quoting *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985)). In such a case the statute can be taken to have committed the decisionmaking to the agency's judgment absolutely. *Id.* at ——, 113 S.Ct. at 2031.

■ With regard to this issue, the Defendant's reliance on *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), is misplaced. Nothing in the APA or in the holding or policy of *Heckler,* precludes review of a proper plaintiff's timely challenge of an agency's announcement of its interpretation of a statute. *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock,* 783 F.2d 237, 245 (D.C.Cir.1986). Though Courts are not qualified to assess enforcement strategies, they are uniquely qualified to decide a legal challenge to an agency's substantive statutory interpretation. *Id.* The Plaintiffs are not challenging the manner in which the Defendant chooses to enforce its interpretation of the NLEA. The Plaintiffs are challenging the interpretation itself and its implementing regulations. This is not the type of discretionary judgment concerning the allocation of enforcement resources that *Heckler* shields from judicial review. *See, Edison Electric Institute v. U.S. EPA,* 996 F.2d 326, 333 (D.C.Cir.1993). In addition, the Court does not find that the terms "substantial compliance" and "significant number of retailers" are so broad that the Court has no meaningful standard to apply. Though the boundaries of agency discretion are broad under 343(q)(4), those boundaries exist nonetheless. If, for example, ninety percent of surveyed stores provided no nutrition information that would be a significant number of retailers out of compliance. Yet, the Defendant presumably would argue that she could find "substantial compliance" without a court disturbing her decision. The Court does not believe that Congress intended to create such a scheme.

The Court, therefore, denies the Defendant's Motion to Dismiss on this ground.

## C. Review of the Regulations Under the "Arbitrary and Capricious" Standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

■ On the merits, the Plaintiffs ask the Court to invalidate the regulations promulgated by the FDA which define "substantial compliance" as that term is used in 21 U.S.C. § 343(q)(4)(B)(ii). The Supreme Court opinion in *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), provides the analytical framework which the Court must use to review an agency's construction of a statute. In *Chevron,* the Supreme Court described a court's initial inquiry:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82.

In the case presently before the Court, Congress did not specifically define the term "substantial compliance". Since Congress did not provide a clear intention as to what it meant by "substantial compliance", the Court must then proceed to the next step and decide whether the challenged regulations are based on a permissible construction of the statute.

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such regulations are given controlling weight

unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S.Ct. at 2782. When an agency exercises authority expressly delegated to it by Congress, it is at the "zenith of its powers." *American Trucking Ass'n v. United States,* 627 F.2d 1313, 1320 (D.C.Cir.1980). The NLEA embodies an express delegation of authority for the Defendant to "issue a final regulation defining the circumstances that constitute substantial compliance by food retailers with the guidelines ... The regulation shall provide that there is not substantial compliance if a significant number of retailers have failed to comply with the guidelines...." 21 U.S.C. § 343(q)(4)(B)(ii). The Court, therefore, will uphold 21 C.F.R. § 101.43(a) and 21 C.F.R. § 101.43(c) unless those regulations are arbitrary, capricious or manifestly contrary to the NLEA.

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The agency, however, must still examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Id.* The Court must review the agency's explanation and determine whether the agency based its decision on a consideration of relevant factors and whether there has been a clear error of judgment. *Id.* The Supreme Court has stated:

[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

The FDA interprets the term "substantial compliance" to mean that "while not all covered retailers are providing nutrition labeling, the most significant segment of the food retailing industry is." *Id.* at 30478. The FDA has awkwardly used the word "significant" to define "substantial compliance" when Congress used the word "significant" to describe the level of non-compliance that would indicate a lack of "substantial compliance." The Court, however, will not invalidate the disputed regulations on semantic grounds if the results of the Defendant's analysis demonstrate a rational connection between the existing conditions in the industry and the decision which the FDA has made.

The Court does not find that regulations 21 C.F.R. § 101.43(c) and 21 C.F.R. § 101.43(a) are arbitrary and capricious. The term "substantial compliance" does not easily lend itself to a precise mathematical calculation. Since a tally of the exact number of people who would receive the nutrition information is not feasible, the statute directs the Defendant to calculate the number of stores providing nutrition information. This criteria is inherently imperfect and enables both sides to envision scenarios in which the percentage of compliance would not reflect the actual number of people receiving the information. Congress, however, specifically directed the agency to consider "[t]he size of the retailers and the portion of the market served by the retailers in compliance with the guidelines ... in determining whether the substantial-compliance standard has been met." § 343(q)(4)(B)(ii). By focusing attention on market share, Congress implied that the success of this legislation would be judged by how many people received nutrition information not strictly by how many stores posted the information. The interpretation of words like "substantial" and "significant" must be read in relation to the number of people likely to receive nutrition information. The Court finds that the FDA faithfully considered these factors in arriving at the substantial-compliance figures.

The FDA's analysis of the industry demonstrates that a small percentage of stores account for an overwhelming majority of grocery sales in the United States. The FDA found that chain and independent grocery stores with annual sales of two million dollars and over represent 18 percent of all U.S.

stores, yet account for 81.5 percent of total U.S. grocery sales. 56 Fed.Reg. 30477. The FDA also reasonably assumed that the headquarter's policy of a chain would apply to the chain's stores with sales over two million dollars as well as their stores with sales of less than two million dollars. *Id.* According to Nielsen Marketing Research, the latter group accounts for an additional 6.6 percent of this country's grocery sales. *Id.* Approximately 88 percent of the U.S. population is served by all chain stores and by independent grocery stores with annual sales of more than two million dollars which demonstrates that the distribution of grocery sales approximates the distribution of the population. *Id.* The FDA concluded that since 52 percent of the stores covered by § 343(q)(4) are chain stores, substantial compliance will not be achieved unless there is "significant" participation by the chains. *Id.* at 30478.

The Plaintiffs argue that the sixty percent threshold creates the possibility that large-scale compliance by the stores with a small market share will allow non-compliance by a small number of stores with a large market share. The Court finds, on the other hand, that all of the chain stores (71% of the entire market) could comply with the statute and yet there would be no "substantial compliance" if the smaller yet numerous stores did not comply. Also, it would be possible for the stores with sales in excess of two million dollars (81% of the market, 31% of stores under the statute) to comply with the statute and still have the FDA make a finding of no "substantial compliance" if the smaller stores did not comply. In addition, under an 80 percent "substantial compliance" standard it would be possible for 88 percent of the market (independents with sales over two million dollars and all chain stores) to have access to nutrition information and still result in non-compliance by the industry since 63 percent of stores under the statute can reach this overwhelming share of the market. In these situations, the larger stores would be punished for the non-compliance of stores that reach a minimal percentage of the market. It appears to the Court, that the FDA has struck a reasonable balance among extreme scenarios that could develop from the statutory scheme.

The FDA also decided that stores must display nutrition labeling for at least 90 percent of produce and fish because "placards may fall down or pages may fall out of books or binders. Therefore, a criterion that required that 100 percent of the covered foods be labeled seems unfair ..." The Court finds that this rationale is not so implausible that it could not be a difference of view or a product of agency expertise. The Court believes that the Plaintiffs' challenge to the regulations centers on the wisdom of the agency's policy and as such it must fail. *See, Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984).

This case presents precisely the type of conflict that must be resolved by the political process rather than by a Court with no constituency. Plaintiffs still possess many options in addition to appellate review. They may appeal to Congress to amend the legislation and specifically indicate the percentage of the food industry which must comply with the guidelines. Or the Plaintiffs may ask the FDA to revise the regulations to reflect their desire for higher "substantial compliance" figures. The Plaintiffs perform fine work on behalf of the public, but the Court believes that the Plaintiffs, in this instance, should direct their work toward the political branches of government.

## IV. CONCLUSION

Accordingly, the Court holds that the regulations promulgated by the FDA, 21 C.F.R. § 101.43(a) and 21 C.F.R. § 101.43(c), are not arbitrary and capricious. The Court, therefore, grants the Defendant's Motion to Dismiss. The Court regards as moot all other motions relating to discovery in this matter.

### ORDER

Upon consideration of the Defendant's Motion to Dismiss, the Plaintiffs' Motion for Summary Judgment, all memoranda and exhibits filed in support and opposition, the entire record of the case and for the reasons set forth in the accompanying Memorandum,

**16**

it is by the Court this 11th day of August 1994,

ORDERED that the Defendant's Motion to Dismiss is GRANTED; it is further

ORDERED that the Plaintiffs' Motion for Summary Judgment is DENIED; it is further

ORDERED that the Plaintiffs' Motion to Supplement and Amend the Complaint under Federal Rule of Civil Procedure 15(a) and 15(d) and Local Rule 108(i) is GRANTED because justice so requires.; it is further

ORDERED that the Plaintiffs' Request that Court Forego Ruling on Pending Motions Until Completion of Discovery and Filing of Supplemental Briefs is MOOT; it is further

ORDERED that the Defendant's motion for Protective Order or, In the Alternative, for a Stay of Discovery is MOOT.